IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| | | |
|---|---|---|
| TOBY KRISTOPHER PAYNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:17-CV-211-Z-BR |
| | § | |
| JAMES SUTTERFIELD, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiff's Motion for TRO and PI, filed December 12, 2020 (ECF No. 34) ("Motion"). Plaintiff is incarcerated in TDCJ's Bill Clements Unit, where he is assigned to the unit's program for chronically mentally ill inmates ("CMI"). He alleges (1) the CMI placement violated his due process rights; and (2) conditions within the program violate Eighth Amendment, the ADA and the Rehabilitation Act of 1973. *See* Complaint § V, at 5 (ECF No. 3). He therefore petitions the Court to enjoin Defendants via either a TRO or a preliminary injunction. *See id.* § VI, at 5. For the reasons below, the Court DENIES the Motion, and DISMISSES Plaintiff's claim as frivolous.

**BACKGROUND**

Plaintiff is serving a lengthy state prison term for murder.[1] He initially was assigned to the TDCJ Neal Unit but was transferred to the Montford Unit after he attempted suicide. *See* ECF No. 3-1, at 5. While in the Montford Unit, Plaintiff allegedly was diagnosed with schizoaffective

---

[1] *See* Texas Dep't of Crim. J., Offender Information: Toby Kristopher Payne, https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action?sid=08361639 (last visited Sept. 1, 2020).

disorder and began psychiatric treatment as part of the Chronic Mentally Ill Program ("CMI"). *See id.* He progressed to the least restrictive CMI level, which allowed him to walk to the chow hall to get food, to watch television in the dayroom with fellow inmates, to shower at a convenient time in the evening, to attend art therapy, and even to work as a janitor. *See* ECF No. 3-2, at 1.

That last privilege opened a Pandora's Box for Plaintiff in 2015. One evening in August, a Montford Unit officer ordered Plaintiff to scrub walls and sweep ceilings in the pod dayrooms and showers. *See* ECF No. 3-3, at 2. Plaintiff believed ADA-related work restrictions exempted him from such work and consequently disobeyed the order. *See id.* at 2-3. He was written up, TDCJ determined at a resulting disciplinary hearing Plaintiff's disobedience was unjustified, and Plaintiff lost his Step 1 and Step 2 appeals of the determination. *See id.* at 3 & 5. Soon after his unsuccessful final appeal, Plaintiff wrote the U.S. Department of Justice Office of Civil Rights ("DOJ OCR") to complain of ongoing ADA violations in the unit. *See* ECF No. 3-1, at 5–10.

Sometime in Fall 2015, TDCJ transferred Plaintiff from the Montford Unit to the Clements Unit where he currently is housed. *Compare* ECF No. 3-1, at 5, *with* ECF No. 3-2, at 1. Within days of his transfer, Plaintiff wrote DOJ OCR to complain about the fewer privileges he enjoyed at his new unit. *See* ECF No. 3-2, at 1–2. Among the perceived indignities, he reported confinement to his cell for twenty-three hours a day, a chance to shower only at approximately five o'clock in the morning, and no access to religious services or a phone. *See id.*

Over the next two years, Plaintiff filed at least *sixteen* Step 1 grievances and *seven* Step 2 grievances alleging abuse at the Clements Unit that targets CMI inmates.[2] TDCJ investigated and

---

[2] Excluding duplicate forms, the Court identifies in Plaintiff's attachments to the Complaint eleven Step 1 and five Step 2 grievances filed in 2016 and five Step 1 and two Step 2 grievances filed in 2017. *See* ECF Nos. 3-1 to 3-10. Because Plaintiff filed the Complaint in October, the Court does not count any forms filed the subsequent two months.

dismissed those allegations. *See* ECF Nos. 3-1 to 3-10 *passim*. Dissatisfied with what he perceived had been a biased and unjust disciplinary process, Plaintiff penned at least *thirty-seven* letters to DOJ OCR on the same matters. *See* ECF Nos. 3-1 to 3-10 *passim*.[3] He solicited corroborating letters from three inmates, one of whom starkly recounts abusive behavior toward CMI inmates including gassing, withholding of therapy, and deprivation of food. *See id.* ¶¶ 1–8, at 5–6.

This flurry of activity culminated in the Complaint, which Plaintiff filed in late 2017. In the Complaint, Plaintiff condenses his claims from the sixty documents above into nine allegations about CMI conditions at the Clements Unit:

> (1) inmates languish in administrative segregation type housing, with solitary confinement virtually all day and night;
> (2) recreation time and showers are limited to the early morning;
> (3) barriers prevent physical contact between inmates and their visitors;
> (4) inmates are only permitted one phone call every three months;
> (5) inmates are barred from attendance at group religious services;
> (6) Defendants do not enforce inmate hygiene or cell sanitation rules;
> (7) Defendants do not provide inmates with regular shaves and haircuts;
> (8) inmates' meals regularly arrive cold; and
> (9) prison personnel provoke inmates into misbehaving.

*See* Complaint § V, at 5. Plaintiff then filed the Motion, in which he sues Defendants in their supervisory capacity and asks the Court to order TDCJ to (1) comply with the ADA and the Rehabilitation Act; and (2) stop violating the Due Process Clause and Eighth Amendment. *See id.*

LEGAL STANDARDS

A. Frivolous Claims

When a prisoner confined in any jail, prison, or other correctional facility brings an action with respect to prison conditions under any federal law, the Court may evaluate the complaint and

---

[3] As in footnote 2 *supra*, the Court here counts merely those letters Plaintiff attaches to his Complaint from January 2016 to October 2017. This count therefore represents a floor for the number of letters in fact written.

dismiss it without service of process, *Brewster v. Dretke*, 587 F.3d 764, 767 (5th Cir. 2009), if it is frivolous,[4] malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2). The same standards will support dismissal of a suit brought under any federal law by a prisoner confined in any jail, prison, or other correctional facility, where such suit concerns prison conditions. *See* 42 U.S.C. § 1997e(c)(1). A *Spears* hearing need not be conducted for every pro se complaint. *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991).[5]

### B. Supervisor Liability Claims

In Section 1983 suits, government officials are not held liable for the unconstitutional conduct of their subordinates solely on a theory of *respondeat superior* or vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Nor are supervisory officials subject to vicarious liability under Section 1983 for the *omissions* of their subordinates. *See Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017). Consequently, absent direct personal participation in the alleged constitutional violation, a plaintiff must prove each individual defendant either implemented an unconstitutional policy that directly resulted in injury to the

---

[4] A claim is frivolous if it lacks an arguable basis in law or in fact. *Booker v. Koonce*, 2 F.3d 114, 115 (5th Cir. 1993); *see Denton v. Hernandez*, 504 U.S. 25 (1992). To determine whether a complaint is frivolous under 28 U.S.C. § 1915(d), the Court must inquire whether there is an arguable "'factual and legal basis of constitutional dimension for the asserted wrong.'" *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985) (quoting *Watson v. Ault*, 525 F.2d 886, 892 (5th Cir. 1976)). The review of a complaint for *factual* frivolousness nevertheless is quite limited and "only appropriate in the limited class of cases wherein the allegations rise to the level of the irrational or the wholly incredible," not just to the level of the unlikely. *Booker*, 2 F.3d at 114. Nor is *legal* frivolousness synonymous with mere unlikeliness. The Supreme Court of the United States and the United States Court of Appeals for the Fifth Circuit repeatedly counsel district courts against dismissing petitions that have some chance of success. *See, e.g., Denton v. Hernandez*, 504 U.S. 25 (1992); *Neitzke v. Williams*, 490 U.S. 319, 329 (1989); *Booker*, 2 F.3d at 116. That caution notwithstanding, a "claim against a defendant who is immune from suit is frivolous because it is based upon an indisputably meritless legal theory. *See Neitzke*, 490 U.S. at 327; *Booker*, 2 F.3d at 116.

[5] *Green vs. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986) ("Of course, our discussion of *Spears* should not be interpreted to mean that all or even most prisoner claims require or deserve a *Spears* hearing. A district court should be able to dismiss as frivolous a significant number of prisoner suits on the complaint alone or the complaint together with the *Watson* questionnaire.")

4

plaintiff or failed to properly train a subordinate employee. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018); *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987).

### C. Cruel and Unusual Punishment

Even though the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment *does* require that prisoners be afforded "humane conditions of confinement" including adequate food, shelter, clothing, and medical care. *Taylor v. Stevens*, 946 F.3d 211, 219 (5th Cir. 2019) (internal marks removed). Prison staff may not deprive prisoners of the basic elements of hygiene or inflict wanton and unnecessary pain by depriving mentally ill patients of needed treatment. *See Perniciaro v. Lea*, 901 F.3d 241, 258–59 (5th Cir. 2019). To establish an Eighth Amendment violation, a prisoner must demonstrate a prison official was deliberately indifferent to conditions that resulted in extreme deprivation of the "minimal civilized measure of life's necessities." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (internal marks removed). To establish deliberate indifference, the prisoner must show the official knew of and disregarded an excessive risk to inmate health or safety; the official must have been both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must have drawn the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### D. Americans with Disabilities Act of 1990 and Rehabilitation Act of 1973

#### *1. Americans with Disabilities Act of 1990*

The Americans with Disabilities Act of 1990 broadly protects disabled individuals and prohibits any public entity from discriminating against the disabled. *See* 42 U.S.C. §§ 12131–32. It covers as a disability any (1) physical or mental impairment that (2) substantially limits (3) one or more major life activities. 42 U.S.C. § 12102(1)(A). The Supreme Court of the United States

narrowly construed these requirements in 2002 to hold that a disability is protected under the ADA only if it effects not only work activities but also similar *non*-work activities. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 199–203 (2002).

Congress amended the ADA expressly to overturn that narrow construction. *See* Pub. L. No. 110-325, § 2(b)(4) (2009). The amendments mandate a particularly broad construction of "substantial limits" and "major life activities." *Id.* § 3(4). "Substantial limits" include any impairment that substantially limits one activity even if it does not limit similar activities. *Id.* § 3(4)(C). "Major life activities" *include* "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 3(2)(A). A condition may qualify as an ADA disability even if it is not severe or permanent. *See id.* § 3(4)(D).

2. *Rehabilitation Act of 1973*

The Rehabilitation Act was originally passed in 1920 as a measure to help disabled military veterans reintegrate into civilian society after World War I. *See* CONGRESSIONAL RESEARCH SERVICE, REHABILITATION ACT OF 1973, at 1 (Feb. 25, 2005). Amendments to the Act in 1973 expanded it to provide comprehensive vocational rehabilitation services for all American individuals with "substantial" physical or mental disabilities. Pub. L. No. 93-112, § 7(6), 87 Stat. 357. As codified after subsequent amendments, the Rehabilitation Act provides that no disabled individual "solely by reason of her or his disability [shall] be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). The Rehabilitation Act remains good law, but its protections largely are subsumed by the broader protections of the ADA. *See* Robyn

Levin, *Responsiveness to Difference: ADA Accommodations in the Course of an Arrest*, 69 STAN. L. REV. 269, 277–78 & n.44 (2017). Because of the overlap, plaintiffs often make identical claims under both statutes. *See, e.g.*, *Hainze v. Richards*, 207 F.3d 795, 797 (5th Cir. 2000).

### 3. Elements of Claims and Available Remedies

To make out a prima facie case under the ADA or the Rehabilitation Act, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Cadena v. El Paso County*, 946 F.3d 717, 723–24 (5th Cir. 2020) (internal marks omitted). A plaintiff also must show the entity knew of the disability, either because he requested an accommodation or because the nature of the limitation was open and obvious. *Id.* at 724.

The remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002). A plaintiff has a right to reasonable accommodations, *i.e.* those that do not impose undue financial or administrative burdens or "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *Frame v. City of Arlington*, 657 F.3d 215, 232 (5th Cir. 2011) (en banc).

### E. TROs and Preliminary Injunctions

The standard for a TRO is generally the same as the standard for a preliminary injunction. *See Kidd v. Director of Federal Bureau of Prisons*, 2020 WL 759298, at *3 (N.D. Tex. Feb. 14, 2020) (internal marks removed). A federal court may issue a preliminary injunction to protect a movant's rights until his or her case has been finally determined. *See* FED. R. CIV. P. 65(a); 11A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 2941 (3d ed. 2020). To

obtain a preliminary injunction, a movant must prove "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Robinson v. Hunt Country, Texas*, 921 F.3d 440, 451 (5th Cir. 2019). A preliminary injunction is an extraordinary remedy requiring the applicant to unequivocally show the need for its issuance. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (internal marks omitted), *cert. denied*, 134 S. Ct. 1789 (2014). The movant must prove *all* four elements. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018); *Doe I v. Landry*, 909 F.3d 99, 106 (5th Cir. 2018).

ANALYSIS

The Court's analysis of the Motion tracks the four *Benishek* factors listed above. If Plaintiff fails to satisfy even one *Benishek* factor, the Court may logically conclude he fails to meet his burden for granting a TRO or preliminary injunction on the corresponding claim even if he proves the other factors.[6] *Cf.* 138 S. Ct. at 1943–44. After thorough consideration of the record, the Court finds Plaintiff fails to prove substantial likelihood of success on the merits of *any* of his claims. It thus DENIES Plaintiff's request for both a TRO and a preliminary injunction on each claim.

A. **ADA and Rehabilitation Act Claims**

The Court first considers Plaintiff's ADA and Rehabilitation Act claims. Under Fifth Circuit precedent, he is entitled to no legal remedy on those claims unless he shows the Clements Unit staff

---

[6] Incidentally, this result holds true *mathematically* even if one of the criteria contains an unknown or non-zero value. Expressed in the language of symbolic logic, $\prod_1^{n-1} p_n = 0 \Rightarrow \prod_1^n p_n = 0$, $\forall_p \in \mathbb{R}$, where $p$ is the probability of success on factor $n$. In other words: If the product of a series of probabilities is equal to zero, then it is logically implied and logically necessary that multiplying by an additional probability will result in a product of zero for any probability that falls into a set of all the real numbers.

knew about his disability at the time of their purported offenses, either because (1) he had requested an accommodation; or (2) the nature of his disability was open and obvious. *See Cadena*, 946 F.3d at 724. Nowhere does Plaintiff adduce evidence he ever requested an ADA or Rehabilitation Act accommodation. Nor is the nature of his disability open and obvious. He is housed in the Clements Unit's program for the chronically mentally ill, but mental illness *by itself* does not secure one ADA protection; the mental illness must (1) substantially limit (2) one or more major life activities. 42 U.S.C. § 12102(1)(A). The very success Plaintiff asserts he had after the onset of his mental illness but before his transfer to the Clements Unit — as well as the diligence and cogency with which he has pursued his grievances since the transfer — suggests no such limitation exists. Finding no contrary evidence in the record, the Court finds Plaintiff is not substantially likely to prevail on the merits of these claims. It therefore denies him a TRO or preliminary injunction on them.

### B. Supervisory Liability Claims

The Court next considers Plaintiff's supervisory liability claims. Plaintiff does not assert supervisor Defendants (1) directly participated in any alleged constitutional violations against him; (2) implemented an unconstitutional policy that directly resulted in his alleged injuries; or (3) failed to properly train Clements Unit subordinates. *See Peña*, 879 F.3d at 620. That failure proves fatal to these claims because Section 1983 suits may not rest solely upon a theory of vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. at 676. Because Plaintiff fails to demonstrate he is substantially likely to prevail on the merits of these claims, the Court denies him a TRO or preliminary injunction on them.

### C. Due Process Claims

Plaintiff's due process claims distill into a challenge to his current housing assignment and classification in the Clements Unit's CMI program. Yet inmates have no protectable property or liberty interest in custodial classifications. *See Alexander v. Texas Dep't of Crim. Justice*, 951 F.3d

236, 240 (5th Cir. 2020). Moreover, administrative segregation is incidental to prison life and almost never a ground for a constitutional claim, insofar as it rarely deprives an inmate of a cognizable liberty interest. *See Wilkerson v. Goodwin*, 774 F.3d 845, 852–53 (5th Cir. 2014); *Hernandez v. Velasquez*, 522 F.3d 556, 562–63 (5th Cir. 2008). Because Plaintiff therefore fails to allege a cognizable and redressable injury-in-fact, he is unlikely to succeed on the merits of these claims. The Court therefore denies him a TRO or preliminary injunction on them.

### D. Eighth Amendment Claims

Lastly, the Court considers Plaintiff's claims he has endured cruel and unusual punishment since his transfer into the Clements Unit. Weighing in his favor, the Eighth Amendment requires prisons to afford inmates adequate food, shelter, clothing, medical care, meaningful opportunities for basic hygiene, and treatment for mental illness. *See Taylor*, 946 F.3d at 219; *Perniciaro*, 901 F.3d at 258–59. Weighing against him, though, the amendment also requires an inmate to demonstrate a prison official was deliberately indifferent to conditions that resulted in extreme deprivation of the "minimal civilized measure of life's necessities." *Arenas*, 922 F.3d at 620 (internal marks removed). To establish deliberate indifference, the prisoner must show the official knew of and disregarded an excessive risk to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. at 837. On balance, the Court finds that Plaintiff fails to demonstrate such extreme deprivation and deliberate indifference. Accordingly, the Court concludes Plaintiff fails to prove substantial likelihood of success on these claims that would warrant a TRO or preliminary injunction.

*1. Early morning recreation and showers*

Plaintiff alleges he faces cruel and unusual punishment by needing to shower and recreate early in the morning. Research that recently won the Nobel Prize for Medicine suggests genetic

predisposition to being a night owl can make one mourn the morning as both cruel and unusual.[7] Yet such feelings do not facially amount to *constitutional* violations insofar as an early-morning wakeup does not automatically result in extreme deprivations of minimal life necessities. *See Arenas*, 922 F.3d at 620; *cf. Brumley v. Livingston*, 459 Fed. Appx 470, 472 (5th Cir. 2012) (dismissing claims based on early-morning showers). As applied to Plaintiff, any harm from early reveille is unlikely irreparable; if Plaintiff is confined to his cell for twenty-three hours a day as he asserts, he likely can go to bed earlier in the evening or nap during the day. Lastly, *enjoining* early morning activities might in fact *harm* Plaintiff because an early wake time is strongly correlated with improved mental health outcomes for those diagnosed with schizophrenia.[8]

### 2. No Contact Visitation Policy

Plaintiff asserts the Clements Unit places physical barriers between mentally ill inmates and their visitors. Yet such barriers fall far short of a violation of the Eighth Amendment. The Supreme Court of the United States has made clear a prison may for good cause deprive an inmate of *any* visitation for years at a time, in part because freedom of association is legitimately curtailed in a prison context. *See Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003). *A fortiori*, an inmate may for good cause have restrictions placed on visitation he does enjoy. *Cf. Martin v. Scott*, 156 F.3d 578, 579 (5th Cir. 1998) (per curiam) (finding no claim where a prisoner claimed that officials limited his visitation time). Plaintiff accordingly is not substantially likely to prevail on the merits of this claim and cannot be granted a TRO or preliminary injunction on it.

---

[7] Press Release, The Nobel Assembly at Karolinska Institutet (June 2018), https://www.nobelprize.org/uploads/2018/06/press-39.pdf (last visited Sept. 1, 2020) (reporting discoveries of mechanisms controlling circadian rhythm).

[8] *See* Samuel E. Jones et al., *Genome-wide Association Analyses of Chronotype in 697,828 Individuals Provides Insights into Circadian Rhythms*, 10 NATURE COMMUNICATIONS 1, 5–6 & fig.5 (Jan. 2019), https://www.nature.com/articles/s41467-018-08259-7.pdf (last visited Sept. 1, 2020).

11

3. *Limited Phone Calls*

During this time of pandemic and social distancing, the Court recognizes the importance for many people of remote contact with family and friends. Yet Plaintiff does not suffer an Eighth Amendment injury even if he accurately states he is only permitted one phone call every three months. Restrictions on inmate communication with the outside world are not extreme deprivations unless an inmate is held completely incommunicado for an extended period. *See Hill v. Estelle*, 537 F.2d 214, 215 (5th Cir. 1976). Because Plaintiff thus does not prove a substantial likelihood of prevailing on this claim, the Court denies him a TRO or preliminary injunction on it.

4. *No Group Religious Services*

Freedom of religious exercise can be a thorny issue in a prison context, and Fifth Circuit standards for how much and how long a prison may limit segregated inmates' access to group religious services are not always immediately reconcilable. *See, e.g., Bailey v. Fisher*, 647 Fed. Appx 472, 476 (5th Cir. 2016). Yet the Court need not unravel this Gordian Knot for two simple reasons. First, Plaintiff nowhere alleges *he* ever has sought to attend any religious services or been denied any religious practice and so does not have standing to assert this claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, the Supreme Court recently held the State may temporarily limit *civilian* gatherings to minimize and eliminate legitimate contagion risks during pandemics. *See generally South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (mem.); *see also Spell v. Edwards*, 962 F.3d 175, 181–82 (Ho, J., concurring) ("Officials may take appropriate emergency public health measures to combat a pandemic," including assembly rights, even though nothing "supports the view that an emergency displaces normal constitutional standards."); *In re Abbott*, 954 F.3d 772, 784–85 (5th Cir. 2020) (Duncan, J.) (citing cases supporting principle that public health crises may *temporarily* permit extraordinary

government intrusion on constitutional liberties to combat contagion). Given widespread COVID-19 infection in American prisons, such restrictions on inmate gatherings aimed at preventing contagion may temporarily be permissible there as well. As such, Plaintiff does not on the record demonstrate a substantial likelihood of prevailing on the merits of this claim, and the Court denies him a TRO or preliminary injunction on it.

### 5. *Personal Hygiene Enforcement, Lack of Access to Regular Barbery*

Plaintiff inveighs against Defendants for purportedly not enforcing inmate hygiene or cell sanitation rules, including not providing inmates with regular shaves and haircuts. *See* Complaint § V, at 5. Even if true, a lack of barbery does not in se prove barbarity. Prison staff may not deprive prisoners of the basic elements of hygiene. *See Perniciaro*, 901 F.3d at 258–59. But it is unclear from Plaintiff's filings and grievances what, if anything, prison personnel are doing to "deprive" Plaintiff's fellow inmates of hygiene supplies or opportunities. In fact, Plaintiff himself asserts showers are made available to CMI inmates early every morning. Because he has alleged no injury-in-fact and does not trace the injury to any action by Clements Unit staff, Plaintiff is unlikely to have standing on this claim and is therefore substantially unlikely to prevail on it. The Court therefore denies him a TRO or preliminary injunction on this claim.

### 6. *Cold Food at Meals*

The Eighth Amendment requires that inmates receive adequate and nutritious food. *See Farmer*, 511 U.S. at 832; *Taylor*, 946 F.3d at 219. But the Fifth Circuit has declined to encompass within that right a right that every meal be an inferno. *See Herman v. Holiday*, 238 F.3d 660, 666 (5th Cir. 2001); *see also Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1984) ("complaints about cold and poorly prepared food must fail"). As such, Plaintiff is not substantially likely to prevail on the merits of this claim and thus cannot receive a TRO or preliminary injunction on it.

### 7. *Provocation of Inmates*

Plaintiff asserts prison guards provoke CMI inmates into misbehaving. *See* Complaint § V, at 5. Yet the record does not contain an allegation that *Plaintiff* has ever been provoked into misbehavior by a prison guard. He therefore has no demonstrated injury-in-fact and does not prove he is substantially likely to prevail on the merits of this claim. The Court therefore denies him a TRO or preliminary injunction on this claim.

In summary, Plaintiff has failed to prove he is substantially likely to prevail on any of his statutory or constitutional claims. He therefore logically cannot satisfy *all* four *Benishek* factors prerequisite for a TRO or a preliminary injunction. The Court DENIES the Motion and DISMISSES Plaintiff's Complaint as frivolous.

**SO ORDERED.**

September 2, 2020.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE